Carla J. MILLER and Megan L. Miller, minor by and through her next friend, Carla J. Miller, Plaintiffs–Respondents/Cross–Appellants,

v.

VARITY CORPORATION, Defendant–Appellant/Cross–Respondent.

Nos. 67862 and 68678.

Missouri Court of Appeals,
Eastern District,
Division Two.

April 2, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 6, 1996.

Application to Transfer Denied June 25, 1996.

---

Thomas R. Larson, Larson & Larson, P.C., Kansas City, Daniel T. Rabbitt & William S. Thomas, Rabbitt, Pitzer & Snodgrass, P.C., St. Louis, for appellant.

Robert L. Langdon, J. Kent Emison & Carter J. Ross, Langdon, Emison & Ross, Lexington, Stephen F. Meyerkord & Jonathan E. Fortmann, Casey & Meyerkord, St. Louis, for respondent.

CRANDALL, Judge.

Defendant, Varity Corporation, appeals from a judgment in favor of plaintiffs, Carla and Megan Miller, after a jury trial in plaintiffs' action for the wrongful death of James Miller. Plaintiffs have filed a cross appeal. We affirm.

On September 29, 1990, James Miller was mowing across the side of a levee on his father's farm. Mr. Miller was operating a Model MF–1130 tractor which was manufactured and sold by Massey Ferguson in 1966.[1] Mr. Miller was pulling an attached shredder. The tractor's left rear tire apparently dropped into a hole and the tractor suddenly rolled over to the left, pinning Mr. Miller. He died of a broken neck at the scene.

Plaintiffs, Carla and Megan Miller, are the surviving wife and minor daughter of James Miller. They brought this action for wrongful death based upon products liability theories. On December 9, 1994, the jury returned a verdict in favor of plaintiffs. The jury found total damages at $2,000,000 and assessed 90% of the fault to defendant and 10% to Mr. Miller. In accordance with the verdict, the trial court entered judgment in the amount of $1,800,000. Then the court entered an amended judgment, reducing the plaintiff's recovery by the $30,000 settlement plaintiffs obtained from a former defendant and awarding them prejudgment interest. Defendant's post trial motions for judgment notwithstanding the verdict or, in the alternative, for new trial or, in the alternative, for remittitur (motion for new trial) were denied.

*Plaintiffs' Cross–Appeal*

■ Plaintiffs contend the trial court erred in entering an order nunc pro tunc changing the file stamp date on defendant's motion for new trial from January 10, 1995, to January 9, 1995.

■ Rule 78.04 required defendant to file its motion for new trial not later than thirty days after entry of judgment. An untimely motion for new trial preserves nothing for appellate review. *Hawthorne v. Hills*, 861 S.W.2d 337, 339 (Mo.App.W.D.1993). It is undisputed that defendant's last day for filing was January 9, 1995. Defendant's motion for new trial was date stamped January 10, 1995, and the entry located in the case minutes likewise indicated a date of January 10, 1995. However, defendant offered to prove that these dates were clerical errors

---

1. Defendant is Massey Ferguson's successor corporation.

and that its motion was actually filed on January 9, 1995, by producing the Federal Express envelope in which the motion was delivered. This envelope was also date stamped January 10, 1995, however, an unsigned handwritten notation read: "To: Division 10 Judge Koehr 1–9–95."[2] In support of its claim that the motion was actually received in the clerk's office on January 9, 1995, defendant also produced an affidavit signed by defense counsel's secretary stating that she had called the circuit clerk's office on January 9, 1995, and had been informed that the motion for new trial had been received on that date; a telephone bill showing that a call was placed to the court on January 9, 1995; an unsigned Federal Express letter stating that a package sent by defendant was delivered to the court on January 9, 1995; and a form generated by defense counsel indicating that a package was sent from defense counsel's office to the court via Federal Express on January 6, 1995.

■ Nunc pro tunc is a Latin phrase meaning "now for then." Black's Law Dictionary 1218 (4th ed. 1968). Rule 74.06 codifies the common law order nunc pro tunc. *Higher Educ. Assistance v. Hensley*, 841 S.W.2d 660, 663 (Mo.1992). Rule 74.06 provides in pertinent part:

> [C]lerical mistakes in judgments ... arising from oversight or omission may be corrected by the court at any time of its own initiative or on motion of any party....

■ An order nunc pro tunc must be supported by some entry, minute or notation in the record. *Unterreiner v. Estate of Unterreiner*, 899 S.W.2d 596, 598 (Mo.App.E.D. 1995). It is settled that parol evidence will not support an order nunc pro tunc. *Id.* Parol evidence is derived from outside sources. *In Re Marriage Rea*, 773 S.W.2d 230, 232 (Mo.App.1989). To justify sustaining a motion for nunc pro tunc order, there must be corroboration from another source in the records or papers of the court. *Grimes v. Bagwell*, 728 S.W.2d 688, 689 (Mo. App.1987).

Although the remainder of the proffered evidence which supported defendant's assertion that the motion was actually received by the clerk's office on January 9, 1995, was parol evidence, the Federal Express envelope was part of the court file.

Defendant contends that there is no dispute that defendant's motion was received by the court on January 9, 1995. Actually, that is the crux of the dispute. If it were clear that the motion had been received on January 9, 1995, it would have been deemed timely even if it was date stamped the following day. *See Hawthorne v. Hills*, 861 S.W.2d 337 (Mo.App.W.D.1993). The salient issue is whether the trial court erred in entering the nunc pro tunc order based upon the record in this case.

Here, three documents in the record are date stamped as received on January 10, 1995: the motion for new trial, the minutes of the proceeding and the Federal Express envelope. The date stamps on the motion for new trial and the Federal Express envelope were initialed by a deputy clerk; the minutes had the first name of the clerk making the entry. However, the handwritten notation was also part of the record and corroborated defendant's nunc pro tunc motion. Further, this notation was directed to the judge that had actually tried the case. The notation indicated the motion was actually received in the clerk's office on January 9, 1995, although not date stamped until January 10, 1995. We believe the court's interpretation of the notation was not an abuse of discretion based upon the record in this case. Plaintiffs' first point on their cross-appeal is denied.

*Defendant's Appeal*

Plaintiffs submitted their case under Missouri's products liability statute, § 537.760, RSMo 1994, which codifies Restatement 2d of Torts § 402A. Section 537.760, RSMO 1994, provides, in pertinent part:

> [T]he term "products liability claim" means a claim or portion of a claim in which the

---

**2.** The Honorable Jack L. Koehr was the trial judge.

plaintiff seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because:

(1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and

(2) The product was used in a manner reasonably anticipated; and

(3) Either or both of the following:

(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold. . . .

Plaintiffs' theory was that the 1966 Massey Ferguson tractor was in a defective condition unreasonably dangerous because it was not equipped with a Roll Over Protection System (ROPS). A ROPS is a roll bar and seat belt or harness combination designed to prevent tractors from rolling more than 90 degrees and to restrain the operator within a protective envelope in the event of a roll over. Evidence was adduced that not only did the industry have the knowledge and technology to make such a ROPS available for this tractor in 1966, but also that a ROPS compatible with this make of tractor actually did exist when the plaintiffs purchased the used tractor from a dealership in 1968, but was not installed, nor was it offered.

■ In its first point on appeal, defendant attacks the submissibility of plaintiffs' cause of action. In reviewing a challenge to the submissibility of a case, the evidence is to be considered in the light most favorable to the plaintiff, plaintiff is to receive the benefit of all inferences reasonably drawn from the evidence and defendant's evidence that does not support plaintiff's case is to be disregarded.

*McDowell v. Kawasaki Motors Corp. USA,* 799 S.W.2d 854, 865 (Mo.App.1990).

■ Defendant attacks submissibility on four grounds. However, two of defendant's grounds of error [3] are not in its motion for new trial and therefore are not preserved for appellate review. Rule 84.13(a). Defendant's other two grounds are preserved; however, the argument portion of defendant's brief does not track its points relied on. *See* 84.04(e). Nevertheless, we will review these two grounds.

■ Defendant's first preserved ground addressing the submissibility of plaintiff's case contends the tractor was not dangerous to an extent beyond that which would be contemplated by the ordinary user of the tractor. This "consumer-contemplation approach" assumes the ordinary user is the best judge of whether the dangers he perceives are outweighed by the benefits of the product and assesses liability only where the actual danger exceeds that perceived by the ordinary user. *Delvaux v. Ford Motor Co.,* 764 F.2d 469, 474 (7th Cir.1985). Missouri has not adopted the consumer-contemplation test for defectiveness. *Nesselrode v. Executive Beechcraft,* 707 S.W.2d 371, 377 (Mo. banc 1986); *Pree v. Brunswick Corp.* 983 F.2d 863, 867 (8th Cir.1993). In Missouri, the salient inquiry in a design defect case is whether the product—due to its design— creates an unreasonable risk of danger to the consumer or user when put to normal use. *Nesselrode,* 707 S.W.2d at 375–76. The concept of unreasonable danger is determinative of whether a product is defective and is presented to the jury as an ultimate issue without further definition. *Id.* at 378; *see, e.g., Wilson v. Danuser,* 874 S.W.2d 507 (Mo. App.S.D.1994) (Jury question as to whether log splitter was unreasonably dangerous and

---

**3.** Defendant's two unpreserved grounds asserted 1) there was no expert testimony that the tractor as sold in 1966 was more dangerous than would be contemplated by the ordinary user of tractors, and 2) there was no evidence from which the jury could infer that the tractor was defective when first sold in 1966 because there was no

therefore defective in action for strict liability based on defective design).[4]

■ Defendant claims the "open and obvious" lack of a ROPS on the tractor would bar recovery since the danger of roll overs would be readily apparent. Defendant relies heavily upon *Morrison v. Kubota Tractor Corp.*, 891 S.W.2d 422 (Mo.App.W.D.1994) for its proposition that a manufacturer could not be held liable for negligent design if the defect or danger is open, obvious and apparent. However, *Morrison* is distinguishable. In *Morrison*, the court was considering the directed verdicts on the plaintiffs' *negligence* claims. Plaintiffs here proceeded under strict liability theories. The *Morrison* court held that such open and obvious defects were not actionable under Missouri's negligence law, but specifically stated in a footnote that it was not deciding whether the open and obvious nature of the peril posed by the absence of a ROPS would justify a directed verdict in a case brought under strict liability theories. *Id.* at 427–28, n. 5.

Defendant's "open and obvious" argument fails because Missouri enacted a statute in 1987 which abolished contributory fault as a complete bar to plaintiff's recovery. Section 537.765, RSMO 1994, provides, in pertinent part:

1. Contributory fault, as a complete bar to plaintiff's recovery in a products liability claim, is abolished. The doctrine of pure comparative fault shall apply to products liability claims as provided in this section.

2. Defendant may plead and prove the fault of the plaintiff as an affirmative defense. Any fault chargeable to the plaintiff shall diminish proportionately the amount awarded as compensatory damages but shall not bar recovery.

3. For purposes of this section, "fault" is limited to:

. . . .

(3) Use of the product with knowledge of a danger involved in such use with reasonable appreciation of the consequences and the voluntary and unreasonable exposure to said danger[.]

Under this statute, the open and obvious nature of the defect is directly addressed in subsection 3(3). Evidence that the defect was readily apparent would not bar plaintiffs' recovery, but could be properly considered in apportioning fault. *See, e.g., Wilson*, 874 S.W.2d at 510–11 (Evidence of plaintiff's voluntary exposure to known danger supported submission of comparative fault instruction). Here, evidence that the lack of ROPS was open and obvious and that the decedent was aware of the danger presented by roll overs was submitted to the jury. The jury determined that the 1966 Massey Ferguson tractor was unreasonably dangerous due to the manufacturer's failure to incorporate a ROPS. Evidence was adduced that ROPS limit cab roll overs to 90 degrees, and when used in conjunction with a seat belt or harness system would have created an "envelope of protection." The jury assessed fault at 10% to decedent and 90% to defendant, and the plaintiffs' recovery was reduced accordingly. The evidence was sufficient to support this verdict. Defendant's first point is denied.

■ In its second preserved ground, defendant claims the evidence failed to establish that decedent would have survived the roll over. Causal connection is established when plaintiffs show that absent the alleged wrongful act the fatal injury would not have been sustained. *Richardson v. Volkswagenwerk*, 552 F.Supp. 73, 85 (W.D.Mo.1982). Plaintiffs' expert testified that in his opinion, within a reasonable degree of professional certainty, the decedent would have survived

proof that the first purchaser's usage was compatible with ROPS.

**4.** The record is unclear as to whether an instruction defining the term "unreasonably dangerous" was given in this trial, contrary to the existing case law as outlined in *Nesselrode*, 707 S.W.2d at

378. The transcript states that such an instruction was given, however, the legal file shows that it was refused. If the trial court did, in fact, give the defining instruction, the error was harmless in view of the verdict for plaintiffs.

the roll over if the tractor he had been operating had a roll over protection system (ROPS) and decedent had been wearing a seat belt. Defendant's expert likewise admitted that if the tractor had been equipped with a ROPS and decedent had been wearing a seat belt, he would not have been crushed. It was adequate in this case for plaintiffs to show that but for the absence of the ROPS, decedent might have survived the roll over. Plaintiffs made a submissible case. Defendant's second point is denied.

We have reviewed the parties' remaining points; no error of law appears. A written opinion on these points would have no precedential value. The remaining points are denied. Rule 84.16(b).

The judgment of the trial court is affirmed.

CRAHAN, P.J., concurs in result in separate opinion filed.

DOWD, J., concurs in opinion of CRANDALL, J.

## OPINION

CRAHAN, Presiding Judge, concurring in result.

I respectfully concur in result. I would affirm the judgment on the ground that the issues on appeal were not properly preserved by a timely motion for new trial. On the merits, I agree that Plaintiffs made a submissible case but cannot join in the majority's analysis of the issue.

It is undisputed that Defendant's motion for new trial was untimely if, in fact, it was filed on January 10, 1995 as indicated by the official clerk's stamp on both the motion and the envelope it apparently arrived in, as well as the official minute entries filed by the clerk's office. The trial court, however, on Defendant's motion and without a hearing, found that the file stamped date of January 10, 1995 was a "clerical mistake" and, pursuant to Rule 74.06(a) ordered the record corrected *nunc pro tunc* to reflect filing on January 9, 1995.

For nearly one hundred years, Missouri has followed the rule that a *nunc pro tunc* order must be based upon the official records of the court.

The record must in some way show, either from the judge's minutes, the clerk's entries, or some paper in the cause, the facts authorizing such entries, and no such entries can be made from the memory of the judge, nor on parol proof derived from other sources.

*Ross v. Kansas City, F.S. & M. Ry. Co.*, 141 Mo. 390, 395, 38 S.W. 926, 42 S.W. 957 (Mo. 1897). "That no such order nunc pro tunc can be made on parol evidence is settled and not open to argument." *Unterreiner v. Estate of Unterreiner*, 899 S.W.2d 596, 598 (Mo. App.1995) (quoting *In re Marriage of Rea*, 773 S.W.2d 230, 232 (Mo.App.1989) and *E.C. Robinson Lumber Co. v. Hazel*, 271 S.W.2d 610, 612 (Mo.App.1954)).

The majority upholds the *nunc pro tunc* order in this case on the basis of a handwritten notation on the Federal Express envelope, which was itself date stamped and filed in the clerk's office on January 10, 1995, one day late. A photocopy of the pertinent portion of the federal express envelope is attached. The printed, unsigned notation relied upon by the majority states: "To Division 10 Judge Koehr 1–9–95." According to the majority, this notation "indicated the motion was actually received in the clerk's office on January 9, 1995, although not date stamped until January 10, 1995." Op. at 824.

Had Defendant offered some competent evidence to support the assumption that the handwritten notation was made by someone in the clerk's office, I would have no problem affirming the *nunc pro tunc* order. The fact is, however, the present state of the record is that the handwritten notation is hearsay. Indeed, it is hearsay from an unknown source written at an unknown time under unknown circumstances. Although it is not parol evidence and thus may be considered in accordance with Rule 74.06, it is not substantial evidence which, standing alone, is suffi-

cient to support the action of the court because it is hearsay. Unless admitted without objection, hearsay evidence is not competent and substantial evidence. *Youngman v. Doerhoff,* 890 S.W.2d 330, 337 (Mo.App.1994); *Hacienda Enterprises No. 2, Inc. v. Smarr,* 841 S.W.2d 807, 811 (Mo.App.1992). To be upheld on appeal, the ruling of the trial court must be supported by substantial evidence. *Rogers v. Ricci Associates, Inc.,* 829 S.W.2d 63, 65 (Mo.App.1992) (citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)).

Without any competent evidence as to who made the notation and when they made it, the majority's assumption that the notation was made by the clerk's office is pure speculation. It is at least as plausible that the notation was placed on the envelope by one of Defendant's counsel's employees as a more specific indication of the place and date delivery was desired.[1] Further, because there is no competent evidence as to *when* the notation was placed on the envelope, there is no assurance that the notation was not placed there after it became apparent that the document was not timely filed. Although I do not in any way suggest that Defendant or its counsel would engage in such subterfuge or did so in this case, we must nevertheless be cognizant of the potential for such unethical behavior in any case. The court's files are accessible by any member of the public. This is the reason why we have official stamps and have uniformly exacted a heavy burden of proof from parties seeking to challenge the record. To accept the flimsy record in this case as sufficient to overcome the official record of the clerk's action invites abuse in future cases.

The fact that the unsigned notation on the envelope was addressed to the judge that tried the case (Op. at p. 824) is of no import. As noted above, there are logical reasons why such a notation might appear on the envelope even if it was made by someone unconnected with the clerk's office. To the extent that the majority's observation suggests that Judge Koehr could properly rely on his recollection of the document being forwarded to him on January 9, 1995, the law is indisputably otherwise. *See, e.g., Grimes v. Bagwell,* 728 S.W.2d 688, 689 (Mo.App. 1987) (*nunc pro tunc* cannot be based on judge's recollection of what took place); *Warren v. Drake,* 570 S.W.2d 803 (Mo.App. 1978) (same).

Nor is the incompetent and insubstantial character of the handwritten notation on the envelope cured or otherwise corroborated by the parol evidence offered by Defendant in support of its motion. Wholly aside from the fact that parol evidence will not support a *nunc pro tunc* order, all of Defendant's evidence on the issue of when the motion was delivered to the clerk's office is hearsay. The secretary's affidavit and records are competent evidence that the documents were given to Federal Express for delivery on January 6, 1995,[2] but the act of depositing a document in the mail does not constitute filing. *Norman v. Landing,* 681 S.W.2d 8, 9 (Mo.App.1984). The affidavit is not competent to establish that the document was received by the clerk on January 9, 1995 because the secretary's only knowledge as to whether the document was received by the clerk on that date is based on what the clerk allegedly told her on the telephone—*i.e.,* hearsay. Likewise, the unsigned letter from Federal Express and associated billing records are not competent to establish delivery to the clerk because these documents are also hearsay and Defendant made no effort to lay a foundation for the documents as business records. Incompetent evidence cannot be used to "corroborate" other incom-

---

1. The secretary's affidavit indicates the envelope was given to Federal Express on January 6, 1995, a Friday. Thus, it is not unreasonable to suppose that a handwritten notation would be placed on the envelope to indicate that delivery was not to occur until Monday, "1–9–95," with a handwritten instruction to deliver it to a specific division and judge.

2. As Plaintiffs point out, however, the certificate of service attached to the motion for new trial allegedly sent on January 6, 1995 recites that it "*was* mailed, postage prepaid, *this 9th* day of January, 1995" to Plaintiffs' counsel. (emphasis added). This discrepancy is not explained in the record.

petent evidence and thereby cure its incompetent and insubstantial character. Parol evidence restrictions aside, there is no competent and substantial evidence to support the trial court's finding that the official file stamp date of January 10, 1995 was a "clerical mistake." Thus, the trial court erred in entering its *nunc pro tunc* order and Defendant's motion for new trial must be deemed untimely. Absent timely filing of a motion for new trial, neither submissibility nor any other issue raised by Defendant is preserved for our review. Rule 78.07; *Noland v. State Farm Mutual Auto Ins. Co.*, 853 S.W.2d 327, 329 (Mo.App.1993). Accordingly, I would affirm the judgment on that basis.

Assuming *arguendo* that the issue of submissibility was properly preserved, I agree that Plaintiffs made a submissible case but respectfully disagree with the majority's analysis of what Plaintiffs must prove to make a submissible case or its conclusion that § 537.765.3(3) RSMo 1994[3] relegates the obviousness of the product's condition exclusively to a question of comparative fault.

At the time of the accident, the Massey Ferguson tractor which is the subject of this case was nearly twenty-five years old. It was originally sold in 1966 to Mr. Tietjens, an unrelated third party not involved in this case, and was resold by the dealer to decedent's father in 1968. It was not equipped with a ROPS, which consists of a roll bar and seat belt or harness. The nature of the ROPS is such that one can tell at a glance whether a tractor is equipped with ROPS or not. Decedent's father had several tractors, one of which, originally purchased by decedent, was equipped with a ROPS.

It is generally known that tractors will roll over under certain circumstances and there was no evidence that this particular tractor was more prone to roll over than others. A ROPS does not affect the tendency of a tractor to roll over. Rather, it is intended to provide protection if and when a rollover occurs.

Defendant urges that the Plaintiffs failed to meet their burden of proof because they did not, and could not, establish that the tractor was more dangerous than would be contemplated by an ordinary user or consumer. This is because the absence of a ROPS is open and obvious from even the most cursory glance at a tractor. Because those who use tractors know that tractors sometimes roll over and, in the absence of a ROPS, there is nothing to prevent serious injury or death if it does roll over, Defendant maintains the absence of a ROPS does not and cannot render the tractor any more dangerous than would be contemplated by the ordinary user.

Although Defendant strenuously urges that Missouri has adopted the consumer contemplation test in this sort of case, the most that can fairly be said is that the law in this area is muddled. In *Keener v. Dayton Electric Manufacturing Co.*, 445 S.W.2d 362 (Mo. 1969), the Missouri Supreme Court adopted the doctrine of strict liability as embodied in the Restatement (Second) of Torts § 402A, imposing liability upon "[o]ne who sells any product in a defective condition [un]reasonably dangerous to the user or consumer...." 445 S.W.2d at 364. *Keener* did not specifically address the definitions of "defective condition" or "unreasonably dangerous" set forth in the comments to § 402A. However, those definitions were adopted and applied in *Aronson's Men's Stores, Inc. v. Potter Elec. Signal Co.*, 632 S.W.2d 472 (Mo. banc 1982). Specifically, the court held that a "defective condition," as provided in Comment g to § 402A, "is a 'condition not contemplated by the ultimate consumer which will be unreasonably dangerous to him.'" 632 S.W.2d at 474. "Unreasonably dangerous," as explained in Comment I to § 402A, "means that: 'The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" *Id.* Together, these definitions encompass what may generally be termed the consumer contemplation test. They are consistent with the general approach of § 402A in that they impose strict, but not

---

**3.** Unless otherwise indicated, all further statutory references in this opinion are to RSMo 1994.

absolute, liability, and generally preclude liability where a consumer's knowledge and appreciation of any danger is equal to the seller's, such as where an adequate warning is given. *See, e.g.,* Restatement (Second) of Torts, Comments j, k. Where the product is in precisely the condition contemplated by the consumer and any danger presented by anticipated use is fully appreciated by consumers generally, there is no liability. Consumers can perform the risk/utility equation for themselves and conduct themselves accordingly.

Although *Aronson's* appeared to settle the law with respect to the consumer contemplation principles embodied in § 402A, four years later in *Nesselrode v. Executive Beechcraft, Inc.,* 707 S.W.2d 371 (Mo. banc 1986), the Missouri Supreme Court said that it had "not yet formally incorporated, in any meaningful way, the Restatement's consumer expectations test into the lexicon of our products liability law." *Id.* at 377. Although the passage in which this language appears was clearly labeled by the court as *dicta, Aronson's* was characterized as merely noting the Restatement definitions and not as necessarily adopting the standard of defectiveness embodied therein. *Id.* at 377–78 and n. 10.

Based on this discussion in *Nesselrode,* the Eighth Circuit later observed that while the Missouri Supreme Court had not adopted the consumer contemplation test, it had not rejected it. *Pree v. Brunswick Corp.,* 983 F.2d 863, 867 (8th Cir.1993). Noting that several Missouri cases had nonetheless applied the consumer contemplation test as embodied in Comment i's definition of "unreasonably dangerous," the Eighth Circuit proceeded to apply the test in holding, as a matter of law, that unguarded boat propellers were not unreasonably dangerous beyond the expectations of the ordinary consumer, thus barring recovery under Missouri product liability law. *Id.* at 868.

*Nesselrode* is also significant in that it states, contrary to the definition set forth in Comment g adopted in *Aronson's,* that the concept of unreasonable danger is determinative of whether a product is defective in a design case, thus essentially equating the terms "defective condition" and "unreasonably dangerous." 707 S.W.2d at 378. It is not clear whether this was intended to be a change in the law and it does not appear that such a change, if intended, would have affected the outcome of *Nesselrode.* If a change was intended, it would be significant because it would remove a previously required element of the plaintiff's case—*i.e.,* that the product was, when it left the seller's hands, in a condition not contemplated by the ultimate consumer. *See Aronson's,* 632 S.W.2d at 474; Restatement (Second) of Torts, § 402A, Comment g. This would also be inconsistent with *Blevins v. Cushman Motors,* 551 S.W.2d 602, 606–08 (Mo. banc 1977), which first set forth the test for strict liability in design defect cases. *See Blevins,* 551 S.W.2d at 608 ("To establish the manufacturer's liability it was sufficient that the plaintiff proved that he was injured while using the [golf cart] in a way it was intended to be used as a result of a defect in design and manufacture *of which plaintiff was not aware* that made the [golf cart] unsafe for its intended use," quoting *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 901 (1963) (emphasis added)). In view of the fact that *Nesselrode* relied on and did not purport to change *Blevins,* however, and the fact that the plaintiff in *Nesselrode* provided proof that the design defect was neither apparent nor appreciated, *Nesselrode* should not be construed as eliminating the "defective condition" element of the plaintiff's case.[4]

Further, whatever significance *Nesselrode* might have had on the development of the product liability doctrine as a matter of common law has been substantially diminished

4. *Nesselrode* was implicitly so construed in *Stinson v. E.I. DuPont de Nemours & Co.,* 904 S.W.2d 428, 431 (Mo.App.1995) (citing *Wilson v. Danuser Mach. Co.,* 874 S.W.2d 507, 513 (Mo.App. 1994), which in turn relied on *Nesselrode*). *See* also *Richcreek v. General Motors Corp.,* 908 S.W.2d 772, 776 (Mo.App.1995). None of these cases, however, considered the impact of § 537.760 *et seq.* on *Nesselrode,* discussed *infra.*

by the enactment of § 537.760 RSMo 1994 *et seq.*, defining the elements of a product liability claim and the defenses applicable thereto. Specifically, § 537.760 defines a products liability claim as a claim for damages on a theory that the defendant is strictly liable because the defendant transferred a product in the course of his business, the product was used in a manner reasonably anticipated and, either or both of the following:

(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or

(b) The product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

Even a cursory review of this statute establishes that the legislature has not equated the terms "defective condition" and "unreasonably dangerous." If the legislature intended the term "defective condition" to mean "unreasonably dangerous," there would have been no reason to employ both terms in § 537.760.3(a)—*i.e.*, "The product was then in a defective condition unreasonably dangerous...." If "defective condition" were construed to mean "unreasonably dangerous," the term "defective condition" would thereby be rendered superfluous and redundant. In determining the meaning of words intended by the legislature the general rules of statutory construction require that meaning be given to each word used in the statute insofar as possible, and one word should not be considered a needless repetition of another. *J.S. DeWeese Co. v. Hughes–Treitler Mfg.*, 881 S.W.2d 638, 643 (Mo.App.1994). In this particular instance, the fact that the legislature intended the term "defective condition" to have some meaning other than "unreasonably dangerous" is further confirmed by comparing the language of § 537.760.3(a) and (b). An action based on an alleged product defect as provided in subsection 3(a) requires proof that the product was in a "defective condition unreasonably dangerous" whereas an action based on failure to warn as provided in subsection 3(b) only requires a showing that the product was "unreasonably dangerous." It necessarily follows that the legislature intended both that the term "defective condition" should be accorded an independent meaning and that it does not mean "unreasonably dangerous."

In the context of § 537.760, the only reasonable construction that can be accorded the terms "defective condition" and "unreasonably dangerous" is to accord them the same meaning they were accorded by the Missouri Supreme Court in *Aronson's*. Not only is the language "in a defective condition unreasonably dangerous" precisely the language employed in the Restatement (Second) of Torts § 402A adopted in *Keener*, the Restatement definitions of these terms were expressly adopted in *Aronson's* and represent the only judicial construction of the terms prior to the adoption of § 537.760. "When the legislature enacts a statute referring to terms which have had other judicial or legislative meaning attached to them, the legislature is presumed to have acted with knowledge of that judicial or legislative action." *Citizens Electric Corp. v. Director of Dept. of Revenue*, 766 S.W.2d 450, 452 (Mo. banc 1989). Thus, under the plain language of § 537.760.3, to make a submissible product defect case, the plaintiff must establish *both* that the product was then in a defective condition—*i.e.*, in a condition not contemplated by the ultimate consumer which will be unreasonably dangerous to him, and that the product was unreasonably dangerous—*i.e.*, that it was dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

The burden of establishing that the product be shown to be in a condition not contemplated by the consumer must not be confused with the defendant's burden of pleading and burden of proving assumption of the risk or other species of comparative fault enumerat-

ed in § 537.765. The focus of the plaintiff's burden is on the defectiveness of the product. Thus, whether the product was in a condition not contemplated by the ultimate consumer refers to the knowledge and appreciation of danger to be expected of any consumer or user of the product as defined in Restatement (Second) of Torts § 402A Comment l. It does not and cannot be construed to mean that the plaintiff must prove that the condition was not known and appreciated by the injured party. At the time the defendant transfers the product in the course of his business the identity of the injured party would not be known. The injured party's knowledge is therefore irrelevant in determining whether the plaintiff has made a submissible case. Thus, the issue of whether the condition is one not known to the consumer is essentially an objective test, requiring proof as to what would be apparent to and appreciated by any consumer of the product, not the consumer that happens to be injured. The injured party's knowledge is a matter of comparative fault. As provided in § 537.765.2, the defendant may plead and prove the knowledge *of the plaintiff* as an affirmative defense. Assumption of the risk as defined in § 537.765.3(3) thus necessarily refers to the plaintiff's knowledge of the risk and appreciation of the danger. This is necessarily a subjective test. *See also* Restatement (Second) of Torts § 402A, Comment n. (Plaintiff's subjective discovery of the defect and appreciation of the danger constitutes assumption of the risk.)

As noted above, Defendant's position in this case is essentially that Plaintiffs failed to establish that the tractor was in a condition not contemplated by the ordinary user or consumer because the absence of a ROPS is obvious to anyone looking at a tractor. Further, Defendant urges that the propensity of tractors to roll over and the consequences of a rollover in the absence of a ROPS are known and appreciated. Thus, Defendant reasons, the absence of a ROPS cannot render the tractor more dangerous than would be contemplated by the ordinary user or consumer. In its brief, Defendant analogizes ROPS to automobile air bags or side impact air bags, the absence of which would be equally apparent to a user or consumer.

Although Defendant's argument undoubtedly has a superficial appeal, it ignores the evidence adduced by Plaintiffs in this case and subtly misportrays the nature of Plaintiffs' defect claim. Although Defendant seeks to portray the dangerous condition in this case as the absence of a ROPS, the dangerous condition identified by Plaintiffs' experts was the *dynamic instability* of tractors which makes them more prone to roll over than farmers generally understand and appreciate. Plaintiffs' experts testified that although a tractor may safely be operated on an even slope of up to thirty degrees or more, the stability of the tractor is dramatically diminished when it is pulling an implement, as this one was, and diminished further still when the tractor encounters unevenness in terrain or a small depression as this one apparently did. According to Plaintiffs' experts, this dynamic instability is inherent in the design of a tractor and cannot be completely removed through changes in design. Plaintiffs' experts testified that farmers, however, do not fully understand and appreciate the manner in which a tractor's stability will be diminished when pulling farm implements or by relatively minor changes in terrain which can cause a tractor to roll over even when the situation appears completely safe to the farmer. Because it is impossible to design a tractor which will not be subject to such unpredictability, Plaintiffs' experts maintained that the only way to make the tractor safe for reasonably anticipated farm operations is to add a ROPS, which will not prevent rollovers, but will, if properly utilized, significantly diminish the likelihood of serious injury or death if a rollover occurs.

This evidence was sufficient to make a submissible case of product defect based on defective design. If believed by the jury, Plaintiffs' evidence was sufficient to permit the jury to find that the design of the tractor presented a risk of rollover in unpredictable situations not fully appreciated by farmers

generally[5] and that in the absence of a ROPS, this inherent dynamic instability condition of tractors presents a danger beyond that which would be contemplated by the ordinary consumer with knowledge common to the community as to its characteristics.

It is certainly true, as Defendant maintains, that anyone looking at the tractor would realize it did not have a ROPS and therefore nothing to protect the operator if the tractor did roll over. But that is not the issue. What is not apparent to the user is the likelihood that the tractor will roll over even in circumstances which appear to be safe. The absence of ROPS is surely no more obvious than the absence of a fourth wheel or the narrow wheel base on the golf cart in *Blevins.* 551 S.W.2d at 608. It is no doubt frequently true that the design of a product is fully apparent from a casual inspection. Yet where the design presents a dangerous condition of which the consumer would not be aware, the manufacturer may be held strictly liable for harm resulting from that condition.

Finally, it is perhaps worth noting that Defendant's attempt to equate a ROPS and an air bag overlooks a fundamental distinction. The danger presented by the dynamic instability of the tractor is a danger created by the product itself which, under the evidence, is a condition not fully understood or appreciated by farmers generally. The ROPS is designed to protect against that danger. The danger addressed by air bags is a danger external to the design of the vehicle—*i.e.,* collision with another vehicle or object. There is generally nothing about the design or manufacture of an automobile which would enhance the likelihood of a collision beyond what the consumer would contemplate. Thus, consumers are fully apprised of the danger and can make their own risk/utility decisions about whether the added safety of an air bag is worth the added expense. On this record, at least, the same cannot be said of roll bars on tractors.

I agree that Defendant's remaining points of error may properly be affirmed pursuant to Rule 84.16(b). Most of Defendant's points pertain to matters within the discretion of the trial court. Although in many instances the circumstances would have supported a contrary ruling, none of the rulings complained of on appeal can fairly be characterized as an abuse of the trial court's discretion. The balance of the points are either unsupported by authority or legally without merit based on established precedent.

For the foregoing reasons, I would affirm the judgment of the trial court.

---

5. It is interesting, and somewhat ironic, that a jury in Jackson County found that a 1982 tractor without ROPS was not defective whereas a jury in the exclusively urban City of St. Louis found that it was. *See Morrison v. Kubota Tractor Corp.,* 891 S.W.2d 422 (Mo.App.1994). This does not, however, affect the submissibility of Plaintiffs' case.